Good morning. I'm Judge Gould and I'm presiding today and delighted to be sitting with my colleagues Judge Graber on my right and Judge Friedland on the left. We have three cases on the calendar that were submitted on briefs, so I'll just note for the record those cases were submitted. One is 221422 Menesquia-Ortiz v. Alvarez. The second one that's on the briefs is United States of America v. Mendoza-Sanchez and that's number 30127. Then the third one on the briefs is there are two parts of that. One part is 2235130. The other part is 2213691. Okay, so then we've got three cases being argued today and I'll just note for the for the advocates that the panel will take a short break after the first two are argued. Excuses are set for 15 minutes per side. So after the first hour of argument and we conclude argument in the AS Major case, we will take a short break. Okay, so we can, without further ado, proceed to the Hawaii Island Air Debtor v. Island Debtors leasing case and the appellant is Lena Hughes. So Ms. Hughes, if you want to make rebuttal argument, please try to stop before you use up your full 15 minutes. Thank you, Your Honor. I would like to reserve three minutes for a rebuttal. Okay, thank you. May it please the Court, Lena Hughes on behalf of Appellant Island Leasing. The bankruptcy court legally and clearly erred in concluding that the debtor Island Air made an avoidable transfer to Island Leasing under Section 547 of the Bankruptcy Code. The bankruptcy court's holding rested principally on its conclusion that the debtor's sale of its aircraft parts was in substance a secured loan. That conclusion should be reviewed de novo for reasons that I'm happy to discuss. But even if reviewed for clear error, it should be reversed because this transaction lacked the essential attributes of a secured loan. And the bankruptcy court's alternative holding on count one should also be reversed because the record was unrefuted that Island Leasing did not lend AAR's first $400,000 payment to debtor. Now, I'd like to begin with the bankruptcy court's recharacterization of the party's sale agreement as a secured loan. That decision was severely flawed because the bankruptcy court failed to consider relevant factors and instead hinged its decision on facts that failed to have whether the terms of the party's transaction created in substance the legal obligations and economic consequences of a secured loan. It could not have recharacterized this transaction. The reason for that is that the debtor did not agree to repay. That was the bankruptcy court's own finding. Island Leasing accepted risk of loss on these aircraft parts and it paid fair market value to buy them. As the bankruptcy court itself found, there was no guarantee that these parts would sell for more than the $800,000 that Island Leasing paid for them. And debtor had no right to regain ownership over the parts or to exclude Island Leasing from their surplus value as a borrower in a true secured loan transaction would. And all of that coincides with the language of the contract which shows that they agreed to a sale and that Island Leasing received all right title and interest to the IL rotables. Now instead of focusing on those factors, the bankruptcy court either disregarded them or treated them as irrelevant. So for instance, take the transfer of risk. This court has said that transfer of risk should be a primary consideration in distinguishing between a sale and a secured loan. And yet the bankruptcy court did not even address whether Island Leasing accepted risk of loss. And its reason for that seemed to be that it thought it was irrelevant because the parties had supposedly thought that there was a low risk of loss as they expected Island Leasing to be able to quickly resell these parts to ELIX. The problem with that is that risk of loss is objective. It's not subjective. It's, I guess, a bit like marriage. People don't get married expecting to get divorced, but divorce is still a real risk. And so too with these aircraft parts, the parties may have expected ELIX to purchase the parts. But if that deal fell through and it ultimately did, then that was a risk that Island Leasing as true owner accepted. So how do we know that? I mean, it seems like the bankruptcy court maybe thought because these parties were related to each other, there were things that had been said that weren't in writing. And how do we know that there wasn't really an obligation to give back the $100,000 sort of regardless of what happened with a sale? I think we know that because the bankruptcy court itself found that debtor did not agree to reimburse. And it thought that the debtor had reasons that it hadn't done that. But the fact that the parties have reasons for not agreeing to a loan isn't a basis to conclude that it was a loan. So to be clear, this would be a very different case if the bankruptcy court had heard the witness testimony and said, you know, I think that in fact debtor did promise to repay. That's what I'm inferring from these facts. We might disagree with that factual finding, but that factual finding would at least legally support the conclusion of a loan. But the rub here is that the bankruptcy court agreed with us. It agreed that debtor did not agree to reimburse, and yet it still found a loan. And that's a problem because a loan with no obligation to repay is not a loan at all. What relevance do you assign to the declaration of Mr. Uchiyama? So I think it has no relevance to the party's characterization of the transaction. And I think the bankruptcy court recognized that because it didn't rely on Mr. Uchiyama. Right, but if you're claiming we have de novo review, you have to convince me that we shouldn't pay attention to it. Absolutely, Your Honor. And the reason for that comes back to a basic principle of contract law. So ordinarily in asking whether parties have reached a contract and what the terms of it are, you look to the objective manifestations of the party's intent. But under the bankruptcy code, I thought that the question relating to the re-characterization of a transaction depends in part on the intention of the parties, which is not an objective fact in the same way. Actually, it is the objective intent of the parties. It is not the subjective intent of the parties. The UCC and the case law indicates that there is a difference. And essentially, re-characterization is a form of contract interpretation. It is a question as to whether the parties have agreed to contract terms that in substance create the legal obligations and rights of a secure loan, despite labeling it something else. It is not a license to deem a transaction to be something other than what the parties have come to an agreement on. And so I guess the issue, though, is like, what did they really agree on? I mean, there was sort of wink, wink, like, let's write this, wink, wink. Wouldn't that intent matter? If there was really an intent, like, we're, you know, we know we're talking about a loan, but we're going to write down that it's a sale, wink, wink. And that would matter, that that was their intent, right? I think it would matter if this was somehow objectively communicated. So just backing up and thinking about an ordinary contract case, say, take Lucy versus Zemmer, which we cited in our brief. This is a classic contract case about two men who go into a bar. One offers to buy the other's farm. The farm owner, thinking this is a joke, writes out a contract to sell his farm. And the court holds he did sell his farm. He's ordered to convey the farm. And it didn't matter that there was this genuine subjective belief that this was a joke, because what was communicated through the language of the party's contract and the objective manifestations of their intent was that there was a sale. And critically here, I mean, the bankruptcy court's own findings are what support us in our conclusion that this was a sale, because they, the bankruptcy court found the debtor did not agree to reimburse. Also, does it matter at all that the document, this very brief document is not just labeled a sale, but also an assignment and has this phrase about having other potentially documents or instruments in furtherance of the assignment. Were there any further documents? I did not see any, but I was curious. There were no further documents in connection with the assignment and sale. The bankruptcy court did find that after the assignment and sale document was executed, there was an agreement between the parties for the debtor to continue storing and maintaining the parts and help marketing the parts. It's possible that that is a reference to the fact that the document, the assignment and sale was also going to be approved by the debtor's secured lenders and by the board of directors, but there's... So why is it called an assignment instead of just a flat-out sale? I think an assignment and sale are duplicative terms, Your Honor. I don't, in fact, I think in the context of factoring agreements, which a number of the cases we've cited involve, it's often an assignment of the accounts receivable, and those are still sales agreements as long as the purchaser of the accounts receivable, in fact, accepted risk of loss. And is that term used with physical property though? This is physical property. That's right. And risk of loss is also used with physical property. So to give you an example, I mean, in Swallows, we had a ranch that was sold, and this court looked to the fact that the purchaser had assumed risk. There was no guarantee of profit from the purchase. If you look... Sorry, I just meant the word assignment. Like, is the word assignment usually used when we're talking about a physical item? Your Honor, I think it can be. I don't think that there's any, and certainly the trustee hasn't cited anything to suggest that an assignment is not, cannot be a sale. It seemed curious to me, though, that that was the way it was phrased. It just seemed odd, and I'm certainly not conversant with the aircraft industry in any way. I don't want you to be mistaken about that, but it did strike me in contractual terms as being an unusual label for a regular sale. I don't actually think that it is unusual, and for that reason, the trustee has never argued that the contract was ambiguous in transferring all right, title, and interest on the IL rotables. The trustee's arguments have instead been focused on the other agreements of the parties. I do want to... So I understand that you think we should reverse even under clear error, but can you talk about what standard applies for a moment? It should be de novo review because this mixed question involves predominantly legal work. Now, I do want to acknowledge there are cases from this court like In re Golden plan that assumed clear error review applies. I want to be clear, we don't think that those decisions are binding holdings because the application of clear error in those cases was dicta, and none of the cases did the functional inquiry that the Supreme Court's later decision in U.S. Bank requires. And when you do that inquiry, I think the standard of review is de novo, and it comes down to institutional advantages. And you don't think we have to do a clearly irreconcilable analysis under Miller v. Gammy because you're reading the earlier cases as not binding regardless? That's correct. I read them as dicta, but even if you thought otherwise, I think it is clearly irreconcilable because if you did the functional inquiry, you would conclude that the correct standard of review is de novo. So looking at the institutional advantages, what this court said in require the court to consider legal principles and make value judgments about the values underlying the law. Mixed questions should usually be reviewed de novo. This case falls within that general rule because in considering whether the basic or historic facts give rise to either a sale or a loan transaction, the court needs to consider legal concepts like what are the legal obligations and rights of a secured loan transaction. And it needs to make judgments about the values underlying the recharacterization doctrine. Namely, when is it appropriate to recharacterize the party's transaction as something other than how they've chosen to denominate it? And another reason that the standard of review should be de novo comes down to stare decisis, and the creation of appellate precedent. This is an area of the law that would benefit immensely from the creation of appellate precedent because just stepping... I'm wondering about that because aren't we applying a state law test for the contract interpretation? So I'm not sure to what extent we can really create uniformity if every state's going to be a little bit different. Well, it's still a question of state law. And in fact, I think the parties here have cited cases from different states, and there's no indication that what a Hawaii than it does in California or in Nevada. So I think there are generalizations the court can make, and it continues to be a question of law rather than a question of fact. Our standard of review might be uniform across the states, but the test we apply to figure out if it's a sale or a loan might be slightly different in different states? I think there could be differences if the state defines a sale or a loan transaction differently. Just to give you an example, we've indicated here that Hawaii law would recognize an economic compulsion to repay as being the equivalent of the contractual promise to repay. If a state doesn't recognize that, then that would be a factor that's not relevant in that state. But absent that, I think there are generalizations that can be made to distinguish a sale from a loan. And if the court were to adopt a de novo standard of review, that would give parties that are being forced to make business decisions in connection with transactions with struggling companies the clarity that they need to make informed business decisions. Because if the answer to whether their transactions will be respected in bankruptcy is, we have no idea, because the bankruptcy court can consider or not consider whatever facts it likes, then that's a very huge disincentive to do any business with struggling companies, making it even harder for them to avoid bankruptcy in the first place. And I see that I have gone over my time. Thank you. So we'd ask that you reverse. Good morning, your honors. May it please the court. Nick Kaprowski on behalf of the trustee Elizabeth Kane. I would like to start by addressing the court's questions from its written order last week. And it's important to keep in mind that there are two findings at issue in this appeal. The first is the true loan versus sale analysis. And then the second is the court's alternative holding that even if it was a sale, there was essentially a loan back of that $400,000. I want to mention that because it often falls through the cracks here. In any event, both of those are subject to the clearly erroneous standard of review. When you look at the two cases that this court highlighted in its order, it's clear from looking at both of those cases. So in the US Bank case, a quote from that case is that the court, and this is the that I'm quoting from the case, the court takes a raft of case-specific historic facts, considers them as a whole, balances them against one another. That describes to a T what the bankruptcy court's was in this case. Similarly, in the US Bank case, the court said in that case that it saw no need, and these are the court's words, to devise a supplemental multi-part test on the issue. And that is precisely what Island Leasing is asking this court to do. It's asking this court to devise a exclusive multi-part test that it wants this court to impose for the state of Hawaii when the Hawaii Supreme Court has addressed this issue multiple times, and that issue is sale versus loan, and has never devised a multi-part test. Rather, it has stuck with the general, it's the intent of the parties, and the court looks at the intent and the true nature of the transaction to derive the intent of the parties. But if we're looking at the true nature of the transaction and using a totality of circumstances, aren't those circumstances still factors that have legal components to them? I would disagree with that, Your Honor, except at the very broadest level. I would not necessarily agree that risk of loss is something that is a legal issue versus an economic issue. I would say that the intent of the parties is certainly a factual issue, whether it's objective or subjective. Typically, the intent of the parties in a decided by the court is a legal issue, so those are factual issues. And it was remarkable to me that counsel's argument just now sounded more like a closing statement than a legal argument, which is indicative of the fact that the true nature of this case is mostly fact. What, in your view, are the facts in the record that support what the court has done with regard to the assumption of risk of loss? Yes, Your Honor. I disagree that there was nothing in the record about risk of loss. And I'm going to point you to a few portions of the record that I think, and not only the record, but the bankruptcy court's own finding. So for instance, the bankruptcy court certainly made the finding that there was no anticipation that there would be a loss. And the district court also made the finding that no one anticipated a shortfall for the selling of these parts. That's on page 30 of the record. And the other aspect of risk of loss that is important, and this court has considered this in the risk of loss analysis, is the right to keep the profit. So for example, in one of the leading cases upon which the appellants rely, which is the S&H case, the court in that case specifically said, as part of the risk of loss analysis, the court needs to look at who gets to keep the profits. Because that is the flip side of the risk of loss. And here there is no question, and there was a finding, a specific finding by the bankruptcy court, that there was an arrangement at the beginning, from the outset, that Island Air would keep at least a portion of the profits. That was in Mr. Uchiyama's declaration, I believe. It was. And I'm glad that you bring up Mr. Uchiyama's declaration, because I think it shows what's really going on in this case, and what the district court really had to look at in terms of facts. And there were two Uchiyama declarations. There's the first one that is in the appellant's record. And then there was a second declaration that we put in the supplemental record. And I think that one is particularly illustrative. In that declaration, Mr. Uchiyama describes a phone call that occurred right before this assignment agreement was signed. And the phone call occurred between him, one of the other board members. There were three board members. Mr. Marinelli of Island Leasing, Mr. Uchiyama, and Mr. Donovan. And then there was Mr. Uchiyama, Mr. Donovan, and the third person on that call was Mr. Au, who was the executive director of Island Air, and who was the representative of the two-third majority shareholder. And on that call, Mr. Uchiyama describes how Mr. Donovan says, I'm uncomfortable with this transaction. Why are we selling these parts for $800,000 when I've been told we're about to sell them to someone else for $1.2 million? How could I approve this? And according to Mr. Uchiyama, Mr. Au then says, wait a minute, Mr. Donovan, you got it all wrong. This is actually a loan. They're only going to get $800,000 back, and we're going to get to keep the rest. And that's what Mr. Uchiyama testified. There's no reason for him to fabricate that. And more importantly... So what do we do with the bankruptcy court statement, debtor never agreed to reimburse Island Leasing? Well, that statement also has to be taken into context with what the bankruptcy court also found on page 46 of the record, which is page 23 of the order. And on that page, he says, he made a finding, the debtor behaved as if it were obligated to get Island Leasing repaid. How do we know that though? I mean, wouldn't it want... It seems like they were trying to sell these parts to someone. They might've been trying to do that anyway. I guess I'm not sure why we know that the fact that they continued trying to make efforts to sell them shows that it was a loan. Well, Your Honor, what we have here in this case is we have a list of probably dozens of different facts and what the bankruptcy court had to do. And again, this goes to why the review should be clear error. What the bankruptcy court had to do and did do was had to decide whether those facts fit more in the loan bucket or fit more in the sale bucket. And when you look at all those facts together, I admit that you could probably come up with a maybe colorable, maybe not colorable scenario where it's actually a sale but not a loan. But the district court looked at all the facts and said, when I look at all these together, and this is what Hawaii law tells them to do, when I look at all these together, this looks more like a loan. So when you look at them piece by piece, each one individually sometimes doesn't make a whole lot of difference or does. But certainly when you look at them all together, it fits in the loan bucket. And one thing I take issue with in the appellant's brief is they'll take factors and they'll say, well, this is equally consistent with a loan or a sale. Often it's not. Often it's more plausibly attributable to a loan. But when you put them all together, it looks a lot more like a loan. Like certainly if the police walk into a room and they see a body on the floor and someone's standing over the body with a gun and the gun is smoking, you could say it's possible that that person just happened to walk in, pick up the gun, the gun was smoking at the time and he's totally innocent. But that's not the most plausible explanation. And that's what the district court had to do here. Counsel, this is probably just once again reiterating my own ignorance about these transactions, but is there any reason why the term assignment is used? Does that have any bearing on our analysis? You know, the true answer to that, Your Honor, is I don't think it does have a bearing on your analysis. We've never argued that. We've never given much weight to that document because it was clear that there was an under the table agreement besides that one paragraph written document. I mean, all the parties agree that there was an agreement that was extrinsic to that document that was material. The focus of disagreement are one, what was that extrinsic agreement? And two, what is the import of that? Import of those terms, sale versus loan. So for instance, Mr. Sciamma comes right out and says the agreement was actually a loan. Mr. Marinelli says, oh no, no, it wasn't a loan. But then there are some terms that they do agree on. I mean, no one agreed that were not in the writing. For instance, Island Air would store, Island Air would market, Island Air would collect the money directly. So is it clear that they, I thought there was some evidence that they didn't think Island Air was going to collect the money directly? Yeah, Your Honor, I said that. And going back to review the record, I'm not exactly certain if that was part of the agreement initially. So I think I probably misspoke there. So thank you for noting that. I'm not certain is what I'm saying. So the other aspect of the deal when we're talking about the facts here, because this is truly a factual question, is to look at the context of this document on June 20th. I'm sorry, can I just back you up to the standard of review? So it seems like your argument for the standard of review is that applying the McConnie-like test, we get to this is more factual. You're not arguing that the earlier cases bind us to clear error review? Well, I would say the subsequent cases should bind this court to clear error. So McConnie comes out in 1984. It sets forth for this test these guideposts. And then you have In re Corrie in 1989. And you have In re Goldenplan in 1987, subsequent to McConnie, which then apply clear error. They don't go through the guideposts, but that's the standard of review that they apply. And you think those are the cases that are... So you don't think we need to use the Supreme Court case of National Bank to tell us what the standard is? You think we're bound by the earlier Ninth Circuit cases? Well, I mean, if you think that the Supreme Court case changes the circuit's law under McConnie, then I think that you would have to apply the Supreme Court case. I think it's consistent with McConnie. And I think if you were to apply the Supreme Court case, the answer would always be the same. I mean, if you look at the Supreme Court case, the question at issue there is what was the true nature of that transaction? Was it arm's length or was it not arm's length? And here the question is, what is the true nature of this And it talks about when clear error should be applied. One of the things that it says, as this court has already brought up, is if there's a question of intent. And in this case, the fundamental factor is what was the party's intent. And so you're saying we should assume that In re Golden Plan was already applying McConnie? I believe so. And I believe you need assume that the In re Golden Plan provides the standard of review for this type of case, and that it didn't simply ignore the law and was, you know, sort of sub silentio erroneous, because that would sort of be the import of a finding here applying de novo. You know, the other thing, it did find clear error, though, so it would have also reversed under de novo, right? So why isn't it dicta? Well, in the I think that's right as to Golden Plan, right? That it reversed under clear error. That's right. But In re Corey affirmed under clear error. You know, another issue, another case that the court may want to look at, which is cited in McConnie is the type of example where it would be clear error is the Supreme Court's case from 1960 and Commissioner versus Duberstein 363 U.S. 278. I mentioned that because it's a similar issue to here. The question was whether a transaction was a gift versus whether it was compensation for services or incentive for intended services, which is again, you know, the type of issue here. What's the nature of the transaction? McConnie's also says that clear error is appropriate where the standard itself incorporates a factual nature to it. And here, if you look at the Hawaii cases and I'm talking about, for instance, the Fukunaga case, and in particular, Hespi Paolo, these are cases where the court specifically says the court must look at all the circumstances. And it says it twice in Hespi Paolo, look at all the circumstances, all the underlying facts and circumstances. So here, the standard set forth by the applicable in the law by the Hawaii Supreme Court is to look at all the facts. So when it's a explicit factual standard, clear error is appropriate. That being said, I only have about 30 seconds left. I will rest my case unless there are any other questions from the panel. None for me. Thank you. No questions. Thank you, Your Honors. Thank you very much. May it please the Court, I'd like to offer just a couple of points. One is on the standard of review. Here, applying U.S. Bank, this is not the type of mixed question that depends on the multifarious, fleeting, special, narrow facts that utterly resist generalization. And I think we know that already if you look at the appellate precedent distinguishing sales from loans that already exists. They have already identified factors like transfer of risk and sub-factors under that that are relevant to distinguishing between a sale and a loan. I would say those cases already implicitly reject the idea that a loan is the type of question that utterly resists generalization. As for the Commissioner v. Duberstein case, the critical point there is that the legal test for intent. And here it's undisputed. The trustee agrees with us. Subjective intent is irrelevant to the characterization of the party's transaction as a sale or a loan. So this does not fall on the subjective intent side of mixed questions, which would be more factual and reviewed for clear error. And I do just want to quickly address the argument about the conversation Mr. Uchiyama alleges he heard. Mr. Marinelli was not alleged to be a part of that conversation, and Mr. Uchiyama testified at trial that the parties only ever discussed this transaction as a sale. They never discussed it as a loan. So whatever was said behind closed doors was not communicated to Island Leasing. And that makes this like Lucy v. Zemmer. The farm owner really sold his farm, and the debtor really sold its aircraft parts. Thank you, Your Honor. Thank you. I want to thank both counsel for their arguments to us. And this case shall now be submitted.
judges: GRABER, GOULD, FRIEDLAND